## IN THE COURT OF APPEALS.

### June Term, 1852.

Present, RUGGLES, Chief Judge, and Judges GARDINER, JEW-ETT, JOHNSON, EDMONDS, WATSON, GRIDLEY and WELLS.

THE PEOPLE v. JAMES SULLIVAN.

THE PEOPLE v. JOSEPH CLARK.

In ascertaining whether an act allowing a writ of error, acts upon a particular judgment, it is competent to look out of the record to see when the judgment was in fact rendered.

An intention to kill existing at the instant of striking the fatal blow, is a premeditated design within the meaning of the statute.

The existence of an actual design to effect death constitutes the difference between murder and manslaughter.

The right to take life in self defense exists only where the party taking the life has done every thing in his power to avoid the necessity of thus defending himself.

THE district attorney of New York having sued out writs of error in these cases on the judgments of the Supreme Court reversing the convictions before the Oyer and Terminer, the cases were now argued.

*N. B. Blunt*, district attorney, made the following points:

II. Every *intentional* killing of a human being by another, without justification or excuse, is MURDER.

The People v. Joseph Clark and James Sullivan.

1. Every *intentional* act is, of course, a willful one, and *premeditation* simply means that the act was done with *reflection*.

2. No specific length of time is required for such delibera-tion. Every case must depend upon its own circumstances. The law, reason, and common sense, unite in declaring that an apparently instantaneous act may be accompanied with such circumstances as to leave no doubt of its being the result of premeditation. (*Com.* v. *Daley*, 4 Penn. Law Jour. 56; *Davis* v. *Stile*, 2 Hump. 439.)

3. Reflection implies deliberation, and *intention* is the con-clusion of reflection, in the mind.

4. Without reflection, there can be no intent; and killing on reflection is, and always was, MURDER.

III. Malice prepense or malice aforethought and "premed-itated design," are *equivalent* terms; and the statute defining murder under the first subdivision, has in no respect altered the definition of the crime, but simply the character and quality of the proof.

Reviser's Notes, 3 R. S. p. 809; *People* v. *Enoch*, 13 Wend. 159; *People* v. *White*, 24 Wend. 580.

1. Thus, to constitute murder under the first subdivision, *express* malice must be proved; and the implied malice of the common law is not sufficient.

2. Express *design to kill*, is express malice. Killing without intent to kill, but with an intent to do great bodily harm, is the implied malice of the common law.

3. No matter how malicious the motive, if the party killing did not intend to kill when he struck the fatal blow, it is not murder under the first subdivision. On the other hand, if he did intend to kill, it is murder.

4. The whole question, then, is one purely of *intent*; and it matters not when the intent was formed, whether at the time of striking the fatal blow or before.

5. The error of those who seek to require a brooding of the mind on the subject, consists in the not discriminating be-tween an absolute intent to kill, and an intent to do great

bobily harm.    If the intent to kill is made out, it is murder; if not, it is manslaughter.

IV. An *intention to kill*, no matter when formed, is the "premeditated design" of the statute.

1. If the particular result accomplished is the one intended, it must have been premeditated, for premeditation is a necessary and unavoidable feature of a specially intended result.

2. The language of the statute is not, that he is necessarily to premeditate the particular mode or means, in which or wherby the result is to be accomplished, but the effect produced must be a premeditated effect.

V. To constitute the crime of *murder*, where the purpose to kill is found, the length of time between the design so formed and its execution, is immaterial. (*Shoemaker* v. *State*, 12 Stanton, 43 ; *Resp.* v. *Mulatto Bob*, 4 Dall. 145.

In this case, C. J. McKean says: "It has been objected, however, that the amendment of our penal code renders premeditation an indispensable ingredient to constitute murder in the first degree.    But still it must be allowed, that the *intention remains as much as ever the true criterion* of crimes, in law as well as in ethics, and the intention of the party can only be collected from his words and actions.    Let it be supposed that a man, *without uttering a word*, should strike another on the head with an ax, it must, on every principle by which we can judge human actions, be deemed a *premeditated* violence.    Whar. Cr. Law, p. 282.

VI. Whenever there is a specific *intention* to take life, such killing is murder; unless justifiable or excusable, or within the statutory definition of manslaughter.

1. The present case falling within neither of these exceptions, it is murder.

"To commit murder," says Judge King, in the case of *Com.* v. *Daley*, "the intent of the party killing must have been to take life." The first inquiry, therefore, after a *felonious* homicide is established, not committed by means of poison, or laying in wait, etc., is whether the mortal blow was given *with the intent to take 'life*, or merely to do great bodily harm.

The People v. Joseph Clark and James Sullivan.

If the former is proved by the evidence, it is *murder*. (4 Penn. Law Jour. 156 – 7.)

2. Unless the killing with intent to kill is murder (except as above stated), then it is no offense within our law.

3. At all events, it is a less offense than killing without intent to kill, or the involuntary killing by the act, procurement or culpable negligence,' of another, while such other is engaged in the commission of a trespass.

4. In other words, it can only fall within the last subdivision of manslaughter in the fourth degree; and we shall then have the absurdity of an intentional killing being made a less offense than an unintentional or involuntary killing.

VII. The judicial construction of the statutes defining murder, in other States, as well as our own, give to the words "premeditated design" no greater effect than appertained to the common law phrase "malice aforethought." (Whar. Cr. Law, pp. 273, 275, 277, 281, 289, 291.)

*R. H. Morris*, for the prisoner, made and argued the following points:

I. There is error in the following portion of the charge of the court to the jury: "The court further charged that if the jury believed that the killing was produced by the prisoner, with an intention to kill, though that intention was formed at the instant of striking the fatal blow, it was murder."

Whereas, the statute declares murder to be "the killing of a human being without the authority of law, when perpetrated from a premeditated design to effect the death of the person killed, or of any human being."

And the common law definition of murder is, "when one with a sedate, deliberate, mind, and formed design, doth kill another." (3d vol. R. S. 2d ed., pp. 807–8–9, Revisors' notes; 2 R. S. 3d ed. 746, §§ 4, 5, sub. 1; 2 R. S. 3d ed. 749, § 1 of Manslaughter; *People* v. *Enoch*, opinion of Chief Justice Nelson, 13 Wend. 163; *Rector's case*, 19 Wend. 569; *Shorter's case*, 2 Comst. 197; *Michael Johnson's case*, tried before

38— vol. 2.

Judge McCoun; new trial granted by Judges Barculo and Brown; 5th Yerger, 340, 459; 10th Yerger, 551; 2d Humphrey's, 441.)

The case put by the court as a case of murder, viz., "the killing with an intention to kill, though that intention was formed at the instant of striking the blow," is not murder, but "the manslaughter of the common law, committed voluntarily upon a sudden heat." (2 Bl. Com. 139; East's P. C. 243; *Taylor's case*, 5 Burr. 2793; *Anderson's case*, 1 Ross, 447; *Kissill's case*, 1 C. & P. 437; *Ayres case*, Russ. & Ry. 166; *Rankin's case*, R. & R. 43; 2 R. S. 754, § 39; 752, § 21; 750, § 12; 751, §§ 18, 19; *People* v. *Shorter*, 2 Comst. 197; *People* v. *Rector*, 19 Wend. 591.)

II. The court erred in refusing to charge as requested, viz.: "If Clark had reason to believe that undue and improper assaults were being committed on his friend Brown, he had a right to interfere for his protection, and if, in his defense, he exceeded the power he was justified in using, he would not be guilty of murder, but of one of the degrees of manslaughter." (2 R. S. 749, § 3; 750, § 11; 751, § 19; *Shorter's case*, 2 Comst. 197; *Rector's case*, 19 Wend. 591; *Enoch's case*, 13 Wend. 163; 5 Yerger, 459; 3 Yerger, 392.)

III. The court erred in refusing to charge as requested, viz., "the weapon used is not evidence of a premeditated design." (2 R. S. 746, § 4.)

At the close of the argument, EDMONDS, J., who had presided at the Oyer and Terminer, said he wanted to call the attention of the counsel distinctly to the question which had so much occupied his mind on this subject, namely: —

As there is no such thing known to our law as the crime of manslaughter, when the homicide is perpetrated with a design to effect death, what is the act of causing death, in pursuance of an intention to kill, formed on the instant? Must it not be murder, or no crime at all?

*Morris*, for the prisoner, insisted it was manslaughter in the fourth degree.

*Blunt, contra*, replied that that would involve this absurdity : that a homicide perpetrated in a cruel and unusual manner, *without* a design to effect death, which is manslaughter in the second degree, and a homicide perpetrated by a dangerous weapon, *without* a design to effect death, which is manslaughter in the third degree, would be punished more severely, and in the law would be a greater crime than a homicide, perpetrated in the same manner, *with* a design to effect death.

*Edmonds, J.*, then called their attention to another consideration which had occupied his mind, also, on this subject, and that was the language which the statute had used when conveying the idea of an intention to kill.

In defining murder the expression is "premeditated design to effect death." In describing manslaughter, the expression is "design to effect death," the word "premeditated" being dropped. Was this accidental, or was it intended? Do both expressions mean the same thing? Or was a different meaning intended, and, if so, what was it?

*Morris* insisted upon the rule of construction which forbade leaving out of a statute any word when it was possible to give it a meaning, for it was to be presumed that it was the intention to use it.

*Blunt, contra*, admitted that the intention of the law maker must govern, but when intentions came in conflict, the particular intention must always yield to the general intention, and therefore the two expressions must be understood as meaning the same thing, or the legislature must be held to have intended that a homicide, neither justifiable nor excusable, when perpetrated with a design to effect death, is no

crime at all, when such design is formed on the instant, and causes the fatal act, which would be absurd.

*Johnson, J.,* delivered the opinion of the court:

The defendant was convicted of murder in the New York Oyer and Terminer, and sentenced to be hanged on the 21st day of November, 1851. At his trial a bill of exceptions was taken, and the case carried, by writ of error, to the Supreme Court, where, in May term, 1852, the judgment was reversed, and a new trial ordered. Upon this judgment of reversal, a writ of error has been brought, in the name of the people, to this court; and we are moved to dismiss the writ upon several grounds.

The first ground is, that, by the record, the judgment of reversal appears to have been rendered on the first Monday of February, 1852, while the act under which the writ of error must be sustained, if sustained at all, was not passed until March 22, 1852; and that, according to the rule established in *The People* v. *Carnel*, at the June term, 1852, the statute in question does not sustain a writ of error upon a judgment rendered before its passage. It appears, however, outside of the record, by affidavits, that the judgment was, in point of fact, rendered in May term, and after the passage of the act. We entertain no doubt whatever that, upon a question of this sort we are entirely at liberty, and are bound to look out of the record to ascertain the true time when the judgment was rendered. Upon this ground we ought not to dismiss the writ. It is also contended that the judgment of reversal in this case does not come within the description contained in the act of those judgments which are to be reviewed according to its provisions. The act says: "Any judgment rendered in favor of any defendant upon any indictment for any criminal offense (except where such defendant shall have been acquitted by a jury), may be reviewed on writ of error on behalf of the people, and the Court of Appeals shall have full power to review by writ of error, in behalf of the people,

any such judgment rendered in the Supreme Court, in favor of any defendant charged with a criminal offense." That the terms "upon any indictment" do not limit the description to judgments not upon verdict, is obvious from the exception which immediately follows, and which would be wholly unnecessary, unless the preceding words of description were broad enough to cover judgments upon verdicts as well as upon demurrer. The clause is, therefore, to be construed as including all judgments in favor of defendants charged with crime, except where an acquittal by a jury has occurred. This brings the case in hand directly within the provision authorizing a review in this court of any judgment rendered by the Supreme Court, in favor of a defendant charged with crime, unless, indeed, in this particular case, to subject the judgment below to this act, would be to give it a retrospective effect. As, however, the act was passed before the rendition of the judgment appealed from, it does not need to be construed retrospectively in order to bring this case within its provisions.

This case is therefore rightly before us for examination upon the merits. If the Supreme Court has erred in reversing the judgment of the Oyer and Terminer, then it is our duty to pronounce judgment against the defendant. The principal question involved in the case arises upon the charge of the judge, who instructed the jury that if the killing was produced by the prisoner, with an intention to kill, though that intention was formed at the moment of striking the fatal blow, it was murder, and that the jury might infer such intention from the circumstances of the case, and among other things from the nature of the weapon and the wounds given by it.

There was nothing in the facts of this case which made it necessary for the court to lay down the law in relation to homicide upon provocation. So far as the prisoner and the deceased were concerned, the deceased does not appear to have made any assault upon him, or to have interfered with him in any way.

The material facts are, merely, that while the deceased was standing on the sidewalk, the prisoner came up and struck him on the head a violent blow, with a heavy cart-rung, of the length of about four feet, and of the thickness of a man's arm; that deceased immediately fell, with his head toward the street, partially over the curb stone; that the prisoner, having for a short interval left the deceased, returned and struck him, while lying on the sidewalk, three blows on the head, with the same cart-rung. Of one of the blows the deceased died, the skull having been fractured at the back of the head.

The Revised Statutes (2 R. S. 656–7, §§ 4, 5), declare "the killing of a human being, without the authority of law (unless it be manslaughter, or excusable or justifiable homicide, as thereinafter defined), to be murder, when perpetrated from a premeditated design to effect the death of the person killed, or of any human being;" and in some other cases, which are not material to be stated for our present purpose. That the homicide in this case was neither justifiable nor excusable, is conceded. Manslaughter in the first degree, except by aiding one to commit suicide, or by killing an unborn and quick child, by an injury to the mother, must be committed without a design to effect death.

The same absence of a design to effect death belongs to manslaughter in the second and third degrees, except in certain cases named in the statute, and which have no resemblance to the case in hand. Manslaughter in the fourth degree, except where the killing is involuntary, includes all killing not justifiable or excusable, and not amounting to murder or manslaughter as before defined. The fact of which the prisoner has been found guilty either amounts to murder, as defined by the first clause of the statute, or it is only manslaughter in the fourth degree. The degree of criminality inherent in the act is plainly greater than belongs to several of the higher degrees of manslaughter; for the prisoner intended to kill, which intention, as we have seen, does not generally exist in any grade of manslaughter higher than the fourth degree. We cannot suppose that the legisla-

ture intended to make an act of so heinous a nature only manslaughter in the fourth degree. If that is the legal grade of the offense, it must be attributed to an oversight on the part of the legislature, growing out of the difficulty of adapting new terms to the expressions of distinctions in the law. Still, whether such an oversight has occurred can only be determined by a careful examination of the statute. The section defining murder (2 R. S. 657, § 5), varies from that reported by the revisors only in this, that it omits a section which included in the enumerated species of murder, homicide perpetrated from a premeditated design to do some great bodily injury, although without a design to effect death. Upon the section as reported, the revisors say "there is no departure from the present law, except in the case of implied malice, arising from being engaged in an unlawful act, as in a riot. If such death was designed, or bodily harm was intended, or the object of the riot was a felony, it would be included in the proposed section. The great principle on which the section rests is this, that to constitute murder there should be an express design to take life, or such circumstances as to induce a very strong presumption of such a design, or such facts occurring in a transaction as would ordinarily lead to the result of taking life."

In the case before us, the question is not whether a design to take life existed ; that has been found by the jury. When the prisoner struck the blow he intended to kill, so that we are not called upon to inquire what other design or purpose, if any, will suffice to constitute the crime of murder. The question here is — an intention to kill existing at the instant of striking the fatal blow. Is such an intention a premeditated design within the meaning of the statute ? The words " premeditated," " aforethought," and "prepense," possess etymologically the same meaning; they are in truth the Latin and Saxon synonyms, expressing a single idea, and may possess, in law, precisely the same force. The statute, so far as this term is concerned, has not altered the law. Malice prepense, however, had attained a broader meaning than belongs to the

term "premeditated design." The intent to take life was not necessary to constitute malice prepense. Even express malice, or malice in fact, is defined to be a deliberate intention of doing *any* bodily harm to another, unauthorized by law (Hale, P. C. 451), and by no means necessarily involved an intent to take life. The change, therefore, which the statute has effected, by substituting the word "design," in place of "malice," is not to alter the nature or design of premeditation requisite to the crime of murder, but to require — which the common law did not — the existence of an actual intention to kill, to constitute that crime under the first subdivision of the fifth section. This view of the law is well sustained by the decisions in those States where the crime of murder has been distinguished by statute into murder, in the first and second degrees. In those States, willful, deliberate and premeditated, killing, is murder in the first degree. The cases are very ably reviewed in Wharton's Am. Crim. Law (2d ed.), pp. 420 and seq., and the clear result of them is, that in cases of deliberate homicide, where there is a specific intention to take life, the offense, if consummated, is murder in the first degree. The degree of deliberation is not different from that required by the common law. As was said by Chief Justice McKEAN, in *Res* v. *Bob* (4 Dal. 146), "the intention remains as much as ever the true criterion of crime, in law as well as ethics. Let it be supposed that a man, without uttering a word, should strike another on the head with an ax, it must, on every principle by which we can judge of human actions, be deemed a premeditated violence." If there be a sufficient deliberation to form a design to take life, and to put that design into execution by destroying life, there is sufficient deliberation to constitute murder, no matter whether the design be formed at the instant of striking the fatal blow, or whether it be contemplated for months. It is enough that an intention precedes the act which follows instantly. The law has no favor to extend, either to rapid or close execution of such a design. In the case before us there was no provocation, no mutual combat, no heat of passion which the law can recog-

nize, for outbursts of ungovernable passion do not excuse a man for any acts of atrocity he may commit under their influence; men are bound to control their passions, and if they suffer them to run away with their reason and senses they ought to suffer for it." (*State* v. *Spencer*, 1 Bab. 206.) We cannot discern a single circumstance which tends in any degree to soften one feature of the atrocity of the defendant's crime. Intending to take his victim's life, the defendant beat him upon the head with a deadly weapon until his design was accomplished. This crime is, by our laws, murder; and we are well satisfied not only that this is the law, but that it could not be relaxed so as to exclude such cases as the present, without substantially diminishing the security of human life.

None of the cases in this State conflict at all with the law as before stated. *The People* v. *Enoch* (13 Wend. 159), only holds that the common law form of indictment is sufficient, under the new statutory definition of murder, and neither *The People* v. *Rector*, *The People* v. *White*, nor *The Same* v. *Shorter*, have any bearing upon the case.

The judgment of the Supreme Court is erroneous, and must be reversed; and the judgment of the New York Oyer and Terminer must be affirmed; and, as the day of execution is passed, the proceedings must be remitted to the Supreme Court to pronounce sentence anew against the prisoner.

*Johnson, J.*, in Sullivan's case, delivered the following opinion:

The question as to the dismissal of the writ of error, and the question upon the bill of exceptions, relating to the charge of the judge, that if the killing was produced by the defendant, with an intention to kill, though that intention was formed at the instant of striking the fatal blow, it was murder, and that the jury might infer such intention from the circumstances of the case, and, among other things, from the

nature of the weapons used, and the wounds given by it, have already been disposed of in the case of *The People* v. *Clark.*

There are some other questions in the case, but they are so obviously against the prisoner, that, except in a capital case, it would be scarcely requisite to notice them in detail. The defendant's counsel requested the court to charge the jury that if they believed that Smith returned up stairs to renew the fight, and Sullivan believes that he intended to do him great bodily injury, he had a right to defend himself, even unto death, and it is not murder. This the court properly refused to charge, for if Sullivan believed himself about to be attacked, as supposed by the request, his duty was to avoid the attack, if in his power to do so, and the right to defend himself would not arise until he had done every thing in his power to avoid the necessity of his defending himself. The court was further requested to charge the jury that if they believed the prisoner, in the heat of passion, caused the death of the deceased, it is not murder. This was properly refused. The designed killing of another, without provocation, and not in sudden combat, is certainly none the less murder because the perpetrator of a crime is in a state of passion.

The court was also requested to charge that if the jury believed that Smith, having had the fight with Sullivan, and by his conduct and blows aroused and excited the passions of the prisoner, and then returned, thereby keeping up the excited passions of the prisoner, and under such excitement the prisoner stabbed the deceased, it is not murder. This request was erroneous, and was properly rejected. Where, after mutual combat, a question arises whether there has been time for excited passions to subside, the question always takes this form: Whether there had been sufficient time to cool, and not whether in point of fact the defendant did remain in a state of anger. The request presented simply the question whether the defendant continued in anger up to the time of killing.

After the several requests which have been noticed, the court charged the jury upon the matters to which they related, as follows: If they believed that Smith returned up stairs with

The People v. Joseph Clark and James Sullivan.

intention to renew the fight, and that Sullivan had a reasonable ground, under the evidence, to believe that Smith designed to do him some great personal injury, and that there was imminent danger of such design being accomplished, then it was not murder. It was contended on the argument that this charge required the jury to find whether imminent danger actually existed, and not merely whether Sullivan had reasonable ground to believe that it existed. If this construction of the charge was correct, the case of *Shorter* v. *The People* (2 Comst. 197), would show it to be erroneous, but we do not so understand the charge. As we read it, the jury were told that if Sullivan had reasonable ground to believe both that Smith designed to do him some great bodily injury, and that there was imminent danger of the accomplishment of such design, it was not murder. This was the proper mode of submitting the question.

The judgment of the Supreme Court is erroneous, and must be reversed, and there must be judgment as in the case against Clark.